IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**CARLOS BALDERRAMA,**

      Plaintiff,

vs.                                             **No. CIV 99-1167 LCS-ACE**

**LIFE INSURANCE COMPANY
OF NORTH AMERICA,**

      Defendant.

**MEMORANDUM OPINION**

      **THIS MATTER** came before the Court for *de novo* review of Defendant's determination that Plaintiff was not entitled to continuing long-term disability insurance benefits. The Court, acting upon consent and designation pursuant 28 U.S.C. § 636, and having reviewed the record before the Plan Administrator *de novo*, and having considered the submissions of counsel, relevant law, and being otherwise fully advised, finds that the decision on the Plan Administrator should be **AFFIRMED** and this case should be **DISMISSED**.

**Background**

      Plaintiff was covered by a long-term disability insurance policy issued by Defendant through his employment with Ecolab, Inc. Plaintiff injured his back at work in December, 1996, and underwent lumbar decompression in 1997. After Defendant determined he was not entitled to continuing long-term disability insurance benefits, Plaintiff brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* seeking judicial review of Defendant's denial of benefits.

**Standard and Scope of Review**

In a June 5, 2000, Memorandum Opinion and Order, I determined that the appropriate standard of review is *de novo* and the record reviewed *de novo* is limited to record before the Plan Administrator at the time the final administrative decision was rendered. (Doc. 25.) Defendant was directed to file the record before the Plan Administrator, Plaintiff was permitted an opportunity to object to the record, and a briefing schedule was set. Plaintiff did not object to the record and the parties have filed their briefs. The case is now ripe for *de novo* review of the Plan Administrator's decision.[1]

In interpreting the terms of an ERISA plan under the *de novo* standard, the court gives the plan language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean. *See Chiles v. Ceridian Corp.*, 95 F. 3d 1505, 1511 (10th Cir. 1996). When a court reviews an administrator's denial of benefits *de novo*, it simply decides whether the decision under review was correct. *See Hammers v. Aetna*, 962 F. Supp 1402, 1405 (D. Kan. 1997).

**Administrative Record**

On December 3, 1996, while working as an environmental specialist at Ecolab, Inc., Plaintiff injured his back while lifting a dishwasher. (R. at 9-10.) Plaintiff continued working until June 10, 1997. (R. at 195-97.) During this period, Plaintiff underwent a course of conservative treatment, including as physical therapy, chiropractic, epidural injections and medication that failed to provide relief. (R. at 9; 118; 201-204.)

---

[1] Plaintiff has not presented an affirmative showing of exceptional circumstances, such as a conflict of interest, that would alter the standard or scope of review. *See* Mem. Op. and Order of Jun. 5, 2000, Doc. 25.

On May 6, 1997, Dr. Kevin J. Sandberg, M.D., performed an electrodiagnostic study of Plaintiff's left leg to rule out radiculopathy. (R. at 195-97.) The results were abnormal and consistent with an acute moderately severe left L5 radiculopathy. (R. at 196.) Dr. Sandberg recommended physical therapy, a swimming program, anti-inflammatory drugs, epidural injections, and evaluation by a neurosurgeon. (R. at 197.) An MRI performed on April 14, 1997 revealed stenosis of the spinal canal at L4/5 and L5/S1 aggravated by posterior midline herniation or annular bulging of both discs. (R. at 243.)

On July 23, 1997, Dr. Bruce San Filippo, M.D., a neurological surgeon, evaluated Plaintiff. (R. at 9-12.) Dr. San Filippo diagnosed multilevel degenerative lubrosacral disease and recommended surgical decompression of the L5 nerve. (R. at 11-12.) Dr. San Filippo advised Plaintiff to avoid heavy lifting, stooping, bending, prolonged driving and sitting. (R. at 12.) On August 6, 1997, Dr. San Filippo performed back surgery consisting of (1) left-sided L4-5 removal of abnormal pars interarticularis and abnormal facet joint with decompression of left L5 nerve root and cauda equine for modified Gill procedure for left spondylilysis without listhesis, (2) excision of herniated nucleus pulposis at L4-5 on the left with extruded fragment, and (3) left-sided L5-S1 medial facetectomy and foraminotomy, take-down of lateral recess for relief of spinal stenosis with exploration, but not removal of L5-S1 disc on the left. (R. 15-21.)

On August 25, 1997, Dr. San Filippo noted that Plaintiff was healing well with some continued symptoms. (R. at 13.) Dr. San Filippo restricted Plaintiff from performing a job requiring lifting above twenty-five pounds, repetitive bending, stooping, prolonged sitting and prolonged driving. (*Id.*) Dr. San Filippo suggested that Plaintiff contact the Division of Vocational Rehabilitation to ascertain whether he qualified for retraining and that he request a light work

3

assignment. (*Id.*)

On October 20, 1997, Dr. Edwin L. Kennedy, M.D., observed residual symptoms and left radiculopathy and prescribed Valium and an exercise program. (R. at 22-23.) Dr. Kennedy opined that Plaintiff was unable to work. (R. at 23.) On November 12, 1997, Dr. Kennedy stated on a Disability Claim form that Plaintiff was unable to work at any occupation. (R. at 45-46.) On November 24, 1997, Dr. Kennedy noted continued decreased sensation in the left big toe and dorsum of the foot, as well as the calf and continued pain in the low back and left calf. (R. at 57.) Dr. Kennedy continued Plaintiff on his exercise program and Valium and concluded that he was unable to work at that time. (R. at 58.)

On February 26, 1998, Dr. Kennedy saw Plaintiff for a re-evaluation and suggestion of treatment. (R. at 61.) Dr. Kennedy noted that it had been six months since his surgery and that his physical therapy results had leveled off. (*Id.*) Dr. Kennedy noted that Plaintiff had some pain in his low back radiating into his left leg and numbness in the left calf and ankle region. (R. at 61-62.) Range of motion in the lumbar spine was one-half normal in flexion and extension. (R. at 61.) Although Plaintiff's gait was unimpaired, he used a cane. (R. at 62.) Plaintiff also reported daily severe headaches that sometimes were accompanied by blurry vision and vomiting. (R. at 61.) Dr. Kennedy opined that Plaintiff was fit for sedentary work activity that allowed for frequent change in positions, no lifting above ten pounds, and no repeated forward bending. (R. at 63.)

On December 8, 1997, Plaintiff applied for Social Security disability insurance benefits. (R. at 54.) After his application was denied initially and on reconsideration, he filed requested reconsideration. (R. at 81.) On his request for reconsideration, Plaintiff stated that his condition had worsened, he was "having massive headaches, burning sensations in [his] back, neck and hip." He

also reported "trembling when [he] write[s] and blackouts." (R. at 84.) The request for reconsideration was denied on April 9, 1998. (R. at 85.)[2]

On April 13, 1998, Dr. Harvey Featherstone, M.D., evaluated Plaintiff's headache complaints. (R. at 69.) Dr. Featherstone noted that Plaintiff's headaches began after he began to exert himself after his back surgery, and were consistent with some type of post-injury headache syndrome. (*Id.*) Although Dr. Featherstone believed that the headaches were "related in some way to the back surgery," he was unable to describe a discrete mechanism. (*Id.*) Dr. Featherstone opined that Plaintiff was a good candidate for comprehensive headache treatment, recommended imaging tests and prescribed medication to alleviate Plaintiff's headaches. (*Id.*)

Plaintiff was referred to Dr. Barrie Weiner Ross, M.D., by his former attorney. (R. at 117.) On July 2, 1998, Plaintiff reported to Dr. Ross that he had continuing low back pain across his lumbar spine radiating into his left calf. (R. at 117.) Dr. Ross noted that while Plaintiff at first denied vision problems, he then agreed with his wife's statement that he complained of intermittent blurred vision. (R. at 117.) Plaintiff also related to Dr. Ross that Dr. Featherstone determined that his back pain was causing his headaches. (*Id.*) This statement is inconsistent with Dr. Featherstone's report. (R. at 69.) Dr. Ross' impression was residual low back pain with radiculopathy and new complaints of one month duration of headaches associated with nausea, vomiting, bloody nasal discharge and one episode of loss of consciousness. (R. at 121.) Dr. Ross opined that the headaches were not related to his work injury or subsequent treatment and recommended that Plaintiff return to work in a light duty capacity with a twenty pound maximum lifting restriction. (R. at 121-22.)

---

[2] This fact is contradicted by Plaintiff's counsel in Pl.'s Resp. to Def's Mot. for protective Order (Doc. 21) where he states that Plaintiff qualifies for Social Security and workers compensation benefits.

On October 28, 1998, Lynne Lonberg, a rehabilitation counselor, and David Shere, a labor market specialist, of Regain Disability Management Services, evaluated Plaintiff's medical restrictions, as determined by Dr. Ross, and vocational skills in order to determine whether Plaintiff had the ability to perform work activities.  (R. 143-155.)  The Regain Report concluded that Plaintiff had the physical capacity and skills to perform the occupations of sales manager, chemical sales representative, building equipment supplies sales representative, and purchasing agent.  (*Id*.)

On November 12, 1998, CORE performed a Functional Capacity Evaluation Report and determined Plaintiff's lifting ability was consistent with sedentary pursuits. (R. at 157.)

On November 16, 1998, Plaintiff saw Dr. Seth Madell, M.D., for follow up care. (R. at 165-67.)  Dr. Madell diagnosed chronic low back pain and residual radicular symptoms.  (R. at 166.)  Dr. Madell opined that Plaintiff was able to tolerate sedentary work so long as he was able to change positions frequently.  (R. at 167.)

A note written on a Zaragosa Medical Center form dated December 28, 1998, stated that Plaintiff was "currently 100% disabled pending re-evaluation." (R. at 171.)  In a letter to Defendant, Plaintiff stated that he had been seen by Dr. Gary Wright of El Paso, that he also had high blood pressure, "poor and weak legs," and shoulder pain.  (R. at 174.)  Plaintiff submitted another note written on a Zaragosa Medical Center form, dated January 26, 1999, stating that he was "currently still 100% disabled."  (R. at 182.)  On March 16, 1997, Defendant wrote to Dr. Wright, a physician at the Zaragosa Medical Center, requesting an up-to-date medical narrative.

On April 13, 1999, Dr. Gary Wright, D.O. wrote a letter to Defendant stating that Plaintiff was 100% disabled from any employment until a "repeat MRI" was performed to re-evaluate the status of his spine. (R. at 234.)  In response to Defendant's request for medical records, Dr. Wright

6

wrote that Defendant had all of Plaintiff's previous medical information. (*Id.*) A repeat MRI was scheduled for June 3, 1999, but was not included in the file. (R. at 283; 294-95.)

**<u>Administrative History</u>**

The policy provides that "An Employee is Disabled if, because of Injury or Sickness, even with Reasonable Accommodation: (1) he or she is unable to perform all the material duties of his or her regular occupation; and (2) after monthly benefits have been payable for twelve months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience." (R. at 315.)

Plaintiff received short term disability benefits under the policy because the Plan Administrator determined that Plaintiff was unable to perform his regular occupation. On October 23, 1997, Defendant notified Plaintiff that on December 7, 1997, his short-term disability benefits would expire and he would become eligible for long-term disability benefits. (R. at 24.) On November 19, 1997, Defendant approved Plaintiff's claim for long-term disability benefits. (R. at 47.) On February 18, 1998, Defendant sent Plaintiff a letter and a benefit worksheet explaining how his benefits were calculated and notifying him that payment of future benefits would depend on certification of continuing disability. (R. at 59-60)

On July 14, 1998, Defendant wrote Plaintiff that his eligibility for benefits would terminate on December 7, 1998. (R. at 93.) In order to evaluate his condition, Defendant asked Plaintiff to submit additional documentation. (*Id.*) On November 12, 1998, Defendant denied Plaintiff's claim for continued disability insurance benefits. (R. at 159-61.) Plaintiff appealed. On May 20, 1999, Defendant affirmed the previous denial of the claim. (R. at 247-49.) Plaintiff appealed again. (R. at 277.) On June 15, 1999, Defendant rendered its final decision denying the claim. (R. at 285-86.)

**Analysis**

In interpreting the terms of an ERISA plan under the *de novo* standard, the court gives the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean. *See Chiles v. Ceridian Corp.*, 95 F. 3d at 1511. When a court reviews an administrator's denial of benefits *de novo*, it simply decides whether the decision under review was correct. *See Hammers v. Aetna*, 962 F. Supp. at 1405. Defendant discontinued benefits because it determined that Plaintiff had failed to provide proof that he was unable to perform any occupation as of December 8, 1998. The decisive issue is whether this determination was correct based on the record.

Four of Plaintiff's physicians opined that he was able to perform at least sedentary work. Dr. Kennedy, Plaintiff's long-term treating physician, determined that Plaintiff was fit for sedentary work activity that allowed for frequent change in positions, no lifting above ten pounds, and no repeated forward bending. (R. at 63.) Dr. Ross, a physician chosen by Plaintiff's former counsel, recommended that Plaintiff return to work in a light duty capacity with a twenty pound maximum lifting restriction. (R. at 122.) Dr. San Filippo, Plaintiff's back surgeon, opined that Plaintiff was capable of working so long as his job did not require lifting more than twenty five pounds, repetitive bending, stooping, prolonged sitting or prolonged driving. (R. at 13.) Dr. San Filippo went so far as to suggest that Plaintiff request retraining and a light work assignment. (*Id.*) Dr. Madell, a treating physician, opined that Plaintiff was able to tolerate sedentary work so long as he was able to change positions frequently. (R. at 167.) The opinions of Drs. Kennedy, San Filippo, Ross and Madell are well-supported by the medical evidence and consistent with the record as a whole.

Dr. Wright wrote that Plaintiff was "100% disabled" until a "repeat MRI" was obtained. (R.

8

at 234.) However, this opinion is brief, conclusory and unsupported by any clinical findings or objective medical tests. Dr. Wright also fails to explain how a second MRI, a diagnostic tool, would alter Plaintiff's ability to work. Dr. Wright's unsupported opinion is inconsistent with the opinions of Plaintiff's other treating physicians and is not a reliable assessment of Plaintiff's ability to perform work activities.

Plaintiff argues that he should be deemed disabled because he has been unable to find a job that will accommodate his limitations. The argument is unsupported. The Regain Disability Report, only vocational evidence in the record, establishes that there are at least four occupations that Plaintiff is capable of performing. (R. at 143-55.) The plan provides that, in order to qualify for continuing long-term disability benefits, Plaintiff must be unable to perform all the material duties of any occupation for which he may reasonably become qualified based on education, training or experience. A reasonable plan participant in Plaintiff's position would understand that the ability to perform other occupations would disqualify him from long-term disability benefits. *See Chiles v. Ceridian Corp.*, 95 F. 3d at 1511. The opinions of Drs. Kennedy, San Filippo, Ross and Madell, combined with the vocational evidence, amply support the Plan Administrator's decision under the unambiguous policy language.

After reviewing *de novo* the record before the Plan Administrator, the Court is satisfied that the decision denying benefits is correct.[3] Plaintiff failed to provide proof that he was unable to

---

[3] Although not raised by either party, disability determinations by the Social Security Administration and other governmental agencies are relevant to, but not dispositive of, the Plan Administrator's decision. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 n.8 (11th Cir. 1999); *Brogan v. Holland*, 105 F.3d 158,160-163 n.2 & 6 (4th Cir. 1997); *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279,1285 (9th Cir. 1990). In an earlier pleading (Doc. 21), Plaintiff's counsel asserted that Plaintiff received both Social Security and workers compensation benefits. However, the administrative record contains no definitive information on Plaintiff's

perform any occupation. Accordingly, the final decision of the Plan Administrator shall be **AFFIRMED** and this case shall be **DISMISSED**.

**AN ORDER AND A JUDGMENT CONSISTENT WITH THE MEMORANDUM OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

---

receipt of government benefits. Because the record is unclear as to whether Plaintiff receives disability benefits from any other source, the Court did not rely on a grant or denial of disability by any government agency. The Court has given no consideration to the Plaintiff having been found disabled or not disabled by the Social Security Administration or the New Mexico Workers Compensation Administration.